IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**RILLA E. REGISTER,**

     **Plaintiff,**

**vs.**                     **Case No.: 5:12cv273-CAS**

**CAROLYN W. COLVIN,**[1]
**Acting Commissioner of Social Security**

     **Defendant.**

_____/

**MEMORANDUM OPINION AND ORDER**

     This is a Social Security case referred to the undersigned U.S. Magistrate Judge upon consent of the parties and reference by District Judge Maurice M. Paul.  Doc. 10. *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire Record, the decision of the Commissioner is affirmed.

**I.  Procedural history**

     On December 5, 2006, Plaintiff, Rilla E. Register, filed a Title II application for a period of disability and Disability Insurance Benefits (DIB), alleging disability beginning January 25, 2006.  R. 19, 57, 119.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Her insured status for disability benefits ended on December 31, 2011.  R. 20, 23.

_____

    [1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

Plaintiff's application was denied initially on April 12, 2007, and upon reconsideration on August 24, 2007.  R. 19, 67, 69.  On October 18, 2007, Plaintiff filed a request for hearing.  R. 19, 71.  On August 3, 2009, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Gerald F. Murray.  R. 44-55.  Robert N. Strader, an impartial vocational expert, testified during the hearing.  (Resume).  Plaintiff was represented by Quinn E. Brock, an attorney.  R. 19.  On September 11, 2009, the ALJ issued a decision denying Plaintiff's application for benefits.  R. 19-43.  On November 9, 2009, Plaintiff filed a request for review.  R. 13.  Plaintiff submitted a brief on April 1, 2011, that was considered by the Appeals Council.  R. 2-3, 5-6, 222-25 (Exhibit 17E).  On July 5, 2012, the Appeals Council denied Plaintiff's request for review.  R. 2-4.  On August 27, 2012, Plaintiff filed a complaint and requested judicial review.  Doc.1.  The parties filed memoranda of law, docs. 14 and 15, which have been considered.

## II.  Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff was born on December 29, 1963, and was 42 years of age, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Plaintiff has at least a high school education and is able to communicate in English.  R. 40.

2. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2011.  R.23.  Plaintiff has not engaged in substantial gainful activity since the alleged onset date of January 25, 2006.  R. 23.

3. Plaintiff has several "severe impairments: Psoriatic arthritis; headaches; and depression."  R. 23.

4. Plaintiff does "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 23.

5. Plaintiff has the residual functional capacity (RFC) "to perform light work as defined in 20 CFR 404.1567(b) except she is limited to unskilled work with no driving involved and cannot work with hazardous machinery.  She can have occasional contact with the general public."  R. 26.

6. Plaintiff "is unable to perform any past relevant work."  R. 40.

7. Transferability of jobs is not material to the determination of disability.  R. 40.

8. "Considering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform," such as hand packer (light/unskilled/SVP 1); cleaner of vehicles (light/unskilled/SVP2); production worker (light/unskilled/SVP2); and packer (sedentary/unskilled/SVP2).  R. 42.

## III.  Legal standards guiding judicial review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[2]

---

[2]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

An ALJ has a basic duty to develop a full and fair record. 20 C.F.R.

---

1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

§ 404.1512(d) ("Before we make a determination that you are not disabled, we will

develop your complete medical history for at least 12 months preceding the month in

which you filed your application."); Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995);

*see* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (rejecting claimant's

argument that ALJ had duty to develop the medical record for time period after his

application for benefits was filed).  "Nevertheless, the claimant bears the burden of

proving that he is disabled, and, consequently, he is responsible for producing evidence

in support of his claim." *Id.* at 1276. (citations omitted).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-

(v):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past
relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  If a claimant has an impairment that is listed

in or equal to an impairment listed in Appendix 1, a finding of disability is made at step

three without considering the claimant's age, education, or work experience.  20 C.F.R.

§ 404.1520(d).  The disability determination is a sequential evaluation, with the step

three determination occurring before the determination of RFC and the ability to perform

past or other work based on the RFC determination.  20 C.F.R. § 404.1520(a)-(g).  A

positive finding at step three results in approval of the application for benefits.  At step

four, the claimant bears the burden of establishing a severe impairment that precludes

the performance of past relevant work.  Consideration is given to the assessment of the

claimant's RFC and the claimant's past relevant work.  If the claimant can still do past

relevant work, there will be a finding that the claimant is not disabled. If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work experience.

Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999);

Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986);

20 C.F.R. § 404.1520(a)(4)(v), (e), & (g).  If the Commissioner carries this burden, the

claimant must prove that he or she cannot perform the work suggested by the

Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Furthermore, acceptable medical sources provide evidence in order to establish

whether a claimant has a medically determinable impairment.  These medical sources

include licensed physicians (medical or osteopathic doctors), licensed or certified

psychologists, and others.  20 C.F.R. § 404.1513(a).   In addition to evidence from the

acceptable medical sources, evidence from other sources may be considered to show

the *severity* of the claimant's impairment and how it affects their ability to work, and

these other sources include nurse-practitioners.  *Id.* § 404.1513(d)(1).

When considering medical opinions, the following factors apply for determining

the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, that is, "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. *Id.* § 404.1527(d).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.

Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)). If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson, 284 F.3d 1225. Failure to articulate the reasons for discrediting subjective

testimony requires, as a matter of law, that the testimony be accepted as true. *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain. One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225. *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).

It is true that an ALJ may credit subjective pain testimony even if objective evidence is lacking. But this is merely permissive guidance. It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise. After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence. Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration,

such as housework or fishing" does not disqualify a claimant from disability).

## IV. Relevant Evidence

## A. Testimony from the Evidentiary Hearing

### Rilla E. Register (Plaintiff)

Plaintiff was born on December 29, 1963, and was 45 years old at the time of the hearing and completed high school. R. 47. Plaintiff was told she had psoriatic and rheumatoid arthritis. R. 47-48. It bothers her most in "[e]very joint in [her] body." R. 48. Her hands get swollen and she has difficulty closing them and she "can't really use them" because she has "[s]evere pain." R. 48. It affects her "every day." R. 48. She takes Remicade for her swelling and hurting, but still had problems after 14 days of use. R. 48. Plaintiff experiences pain and burning in her feet. R. 49. Her back pain affects her ability to sit, stand, and walk. R. 49. She can stand for probably ten minutes before she starts "switching from side to side." She expressed similar limitations while sitting. R. 49. She takes Lortab twice a day and another medication but still has to "switch from side to side or get up" after sleeping. R. 49-50. Plaintiff estimates that she experiences pain on an average day of eight on a ten-point scale. R. 49-50. Her hands felt like they were on fire prior to being diagnosed, but are now "better than being on fire." R. 50. She takes naps five or six times for an hour each in an eight-hour day. R. 50.

Plaintiff experience headaches--severe migraines approximately every other day. R. 50-51. She got a nerve block in her neck and "they went away for a long time." She is taking Topomax that has slowed then headaches down for a long time. She ran out

of medication because she could not afford it.  Her doctor re-ordered her medication and she is taking it and the headaches are "easing off again."  R. 51.  When taking medication, she has the headaches "[a]bout once a week, which is "as good as it got." They usually "last a long time."  She takes a Lortab and "sleep[s] them off."  R. 51.

Plaintiff has mental illness--"bipolar . . . schizophrenic."  R. 51-52.  She has been to many psychiatrists.  R. 52.  Plaintiff hears things that are not present.  R. 52.  Also, her son hates her and says she does not "have a mental illness (INAUDIBLE).  He don't understand."  R. 52.  She does not go anywhere.  R. 52.  For example, her husband had a heart transplant in Jacksonville and she could not stay with him because if she heard something, he would have to get up and make sure there was nothing present.  Now, she on the right medication and she is "on the road again," but it has to be adjusted. R. 52-53.

Plaintiff also stated she has restless leg syndrome and sleep apnea.  R. 53. Plaintiff stated that she was told this by Dr. Padget, but he retired and she is looking for another doctor.  R. 53.

### Robert M. Strader (vocational expert (VE))

Mr. Strader testified without objection.  R. 46.  Mr. Strader stated that based on his review of the record, Plaintiff "was a food support worker, which is closely aligned to a cook helper" that is described as unskilled, medium work.  R. 46.  Plaintiff stated that this was "all [she] put in the record."  R. 47.  Plaintiff also stated that she always worked in "food, fast food like that."  R. 47.

The ALJ inquired of Mr. Strader:

Q  All right.  Mr. Strader, consider an individual is limited to a range of light work with only occasionally contact with the general public, and limited to unskilled work with no driving involved or hazardous machinery.  Could you give me examples of occupations that might fit in that--those parameters?

A  Hand packing would fall into that.  There approximately 15,000 in the state, approximately 318,800 nationally.  <u>DOT</u> number is 920.687-018, and that's unskilled, at one.  Cleaner of vehicles and equipment.  There are approximately 4,500 in the state, approximately 71,400 nationally.  <u>DOT</u> number is 915.667-010.  And that is also unskilled, at two.  We could have production worker.  There are approximately 3,100 in the state, approximately 86,700 nationally.  <u>DOT</u> number is 369.687-018.  That's unskilled at two.  Give you some examples, Your Honor.

Q  And I presume it would be additional at the sedentary level?

A  Well, the sedentary level you'd have production worker.  There's approximately 800 in the state, approximately 28,600 nationally.  <u>DOT</u> number is 726.687-046.  And that's unskilled at two.  You'd have like a packer positions, approximately 1,000 in the state, approximately 22,000 nationally.  <u>DOT</u> number is 559.687-014, and that's also unskilled at two, Your Honor.

R. 53-54.

Plaintiff's counsel referred to Exhibit 25F that included patient notes from Kathryn

M. Land, ARNP, R. 54, 586-628, and asked Mr. Strader the following:

Q  If you take an individual who would have a marked impairment in their ability to interact appropriately with the general public, an extreme impairment in their ability to get along with coworkers or peers, and extreme impairment with restriction of interest of the claimant . . . Restriction of interest.  An extreme limitation in their ability to attend meetings, work around the house, socialize with friends and neighbors.  Further, they would have an extreme limitation in their ability to complete a normal work day or work week within interruptions from psychologically based symptoms and perform without an unreasonable number and length of rest periods.  There's further limitations, but with those limitations, would such a claimant be able to do any of the jobs that you've listed or any other jobs in the national economy?

R. 54-55.  Mr. Strader responded "No, sir."  R. 55.  Counsel inquired further:

Q  Her physical doctor stated that pain is very significant in her case that she's testified to.  And he stated that pain is present to an extent to be distracting to adequate performance of daily activities or work.  And if that went to mean that they would be unable to maintain concentration, persistence and pace for periods of two hours or longer, would such an individual be able to perform any of the jobs that you've mentioned previously or any other jobs in the national economy?

R. 55.  Mr. Strader responded: "No, sir."

## B.  Medical Evidence

### 1. Treating Medical Sources

### a.  Glenn Padgett, M.D.

On approximately September 23, 2003, Plaintiff was first examined and treated by Glenn Padgett, M.D., who became Plaintiff's primary care physician.  R. 273-88.  On January 26, 2006, Dr. Padgett noted that Plaintiff had been dizzy off and on for a couple of weeks.  He diagnosed Plaintiff with acute persistent vertigo and another that another diagnosis that is difficult to read.  Dr. Padgett referred Plaintiff to Dr. Evans.  R. 279.

On April 6, 2006, Dr. Padgett noted that Plaintiff reported to being dizzy, falling, etc., having headaches, unable to do housework and cook.  An appointment was made for Plaintiff to see Dr. Whitney, a neurologist.  Dr. Padgett's diagnosis was "left subclavian stent."  R. 277.

On August 4, 2006, Dr. Padgett diagnosed Plaintiff with anxiety and severe psoriatic arthritis.  The plan was to send her to a psychiatrist.  R. 274.  On August 10, 2006, Dr. Padgett noted that he completed a form for "unemployment (disability)" and diagnosed Plaintiff with depression, anxiety reaction, and psoriatic arthritis.  R. 273.

**b. Anthony Evans, M.D.**

On February 1, 2006, Plaintiff saw Dr. Evans, a cardiologist, for vertigo.  R. 261. It is noted that Plaintiff had a history of a left subclavian stent associated with left arm syndrome in 1997.  Plaintiff denied chest pain or shortness of breath, other than the dizziness.  When Dr. Evans asked Plaintiff how far she could walk, she answered "'forever.'"  R. 261.  Dr. Evans noted that Plaintiff's dizzy "episodes do not seem particularly with certain positions.  They just come out of the blue.  They are not associated with activity or exertion.  She denies orthopnea or PND.  She has rare fluttering in her chest but that is not associated with the dizziness."  R. 261. Dr. Evans believed that the most pressing issue is neurologic and considered referring her to a neurologist.  R. 261.

On February 21, 2006, Plaintiff returned to Dr. Evans.  R. 262.  A 2D echocardiogram performed on February 1, 2006, showed normal LV size and function; no cardiac enlargement; and no pericardial effusion.  R. 262.  Plaintiff was encouraged to follow-up with the neurologist, Dr. Jacob.  Dr. Evans found nothing to suggest a primary cardiac etiology.  Plaintiff was scheduled to follow-up with Dr. Mullis regarding her general mental health and long-term treatment.  R. 262.

A brief patient note from Dr. Evans stated that there were no cardiac reasons why Plaintiff may not return to work.  R. 315.

**c. E. L. Jacob, M.D.**

Plaintiff saw a neurologist, Dr. Jacob, on February 9, 2006, for evaluation of headaches and dizziness.  R. 260.  Plaintiff had tenderness over the greater occipital

nerve bilaterally, but full range of motion of her neck, although lateral rotation was painful.  R. 259.  The examination of Plaintiff's low back was normal.  R. 259.  Plaintiff's higher intellectual functions were normal as well as her speech, memory, and affect.  R. 259.  Plaintiff's motor and sensory examinations were also normal.  R. 258.

Dr. Jacob ordered an MRI and MRA of the brain, R. 258, which were normal.  R. 263-64, 292.  There is a brief February 24, 2006, patient note from Dr. Jacob stating that Plaintiff had been seen on this date and that she "will need to be off work till she can have the physical therapy that has been ordered with Deone Jones."  R. 315.

Dr. Jacob's impression was progressive headache for the last three years.  R. 258.

### d. Mustafa A. Hammad, M.D.

On April 13, 2006, Plaintiff presented to Dr. Hammad, a neurologist, for a second opinion concerning her headaches.  Plaintiff denied any weakness and any loss of vision at any time.  R. 292.  Plaintiff was in no apparent distress.  R. 292.  Plaintiff was alert and oriented to person, pace and time; able to follow simple and complex commands; has immediate recall; and short and long-term memory was normal.

Dr. Hammad's impressions were probable basilar migraine; history of left subclavian artery stent; history of gastric bypass surgery; and depression.  R. 293.  Part of the plan included the following observation: "Another possibility that we will entertain after ruling out other possibilities is depression and anxiety, although I mentioned it to the patient and she denies any stress in her life or being anxious."  R. 294.  Dr. Hammad ordered an MRI and MRA of the neck, which were essentially normal, R. 293, 296, and started Plaintiff on Topamax.  R. 293, 296.

On May 1, 2006, Plaintiff reported tolerating Topamax well, but continued to complain of similar symptoms without significant improvement. R. 295. Impressions were similar, although it was noted that Plaintiff had episodes of slurring speech, dizziness, and lightheadedness, which could be due to the basilar migraine. R. 296. Plaintiff was continued on Topamax. R. 296. (On May 1, 2006, Dr. Hammad wrote a note excusing Plaintiff from work from May 11, 2006, until June 2, 2006, when she could return to work, R. 305, and similar notes thereafter excusing Plaintiff from work until approximately August 7, 2006, due to migraines and occipital neuralgia. R. 307-09. On June 2, 2006, Dr. Mullis wrote a note stating no work from June 2, 2006, to June 30, 2006. R. 306.)

In June 2006, Plaintiff reported improvement of her headaches with Topamax, but she had some arthralgia in the hands and swelling on the joints of the hands. R. 297, 299. She also had tenderness over the greater and lesser occipital notches bilaterally. R. 297, 300. Dr. Hammad administered occipital nerve blocks which improved Plaintiff's headaches immediately. R. 300-01.

In July 2006, Plaintiff reported a "complete resolution of her headaches." R. 303-04. She had tenderness over her hands and feet, however, with a rash, and reported that Hulon Crayton, M.D., an internist, had diagnosed her with psoriatic arthritis. R. 303.

In September 2006, Plaintiff's headaches were "very mild," but Dr. Hammad stated that Plaintiff was unable to work due to severe joint pain. Dr. Crayton had diagnosed Plaintiff with psoriatic arthritis and started her on Remicade. R. 350. Plaintiff was continued on Topamax and instructed to continue with Dr. Crayton. R. 349.

In November 2006, Plaintiff complained of generalized aches and pains for which Dr. Hammad prescribed Ultram.  R. 347.  With regard to Plaintiff's headaches, Dr. Hammad stated that Plaintiff "has been doing very well.  Her headaches are significantly better however she continues to complain of some headaches occasionally."  R. 347.

In December 2006, Plaintiff reported "doing very well" as Ultram provided significant pain relief and she had not had any headaches.  Her only complaint was ringing in her ear.  Plaintiff was alert and in no apparent distress; oriented; able to follow simple and complex distress; normal gait; and other normal findings.  R. 345.

Plaintiff returned to Dr. Hammad's office on June 27, 2007, and complained of low back pain.  R. 452.  Although she had tenderness and tightness in her low back, straight leg raise tests and crossed straight leg raise tests were negative.  R. 451.  Her positive mental status remained the same.  R. 451.  Another doctor from Dr. Hammad's practice prescribed Plaintiff Robaxin.  R. 450.

On September 19, 2007, Plaintiff reported neck and back pain.  R. 756.  Her headaches have been well controlled.  She had been taking Ultram.  She complained of numbness/tingling sensation involving her upper and lower extremities and neck and lower back pain.  R. 756.  Plaintiff's mental status remained unchanged; her gait was normal; and she had normal tone with strength of 5/5 in the upper and lower extremities.  R. 756.  The dosage for Ultram was increased and continued on Robaxin.  R. 756.

By December 17, 2007, Plaintiff was "doing relatively better," but was out of her medication which aggravated her pain.  R. 754.  Dr. Hammad advised Plaintiff to take

Topomax, Lortab, and Ultram ER.  R. 755.   On December 14, 2007, Dr. Hammad

completed a physical capacities evaluation and opined that Plaintiff could only lift 5

pounds frequently and 10 pounds occasionally; sit for 4-6 hours in an 8-hour workday;

stand or walk for 2 hours in an 8-hour workday; could rarely perform fine manipulation;

and could only occasionally push, pull, climb, perform gross manipulation, bend and/or

stoop, and work around hazardous machinery.  R. 630.  He could not predict the

number of days Plaintiff would be absent from work--it depended on pain.  R. 630.

Dr. Hammad's basis for these restrictions was "Patient with arthritic pain that can limit

function."  R. 630.  He also opined that Plaintiff's pain would be so distracting that it

would prevent her from adequately performing daily activities, work, or from completing

tasks and that regarding side effects of medication, there may be some limitations but

not to such a degree as to create serious problems in most instances.  R. 631.

From January 2008 through July 2008, Dr. Hammad consistently reported that

Plaintiff was doing well and only noted "some arthritic changes in the hands."  R. 739-

43, 749-53, 744-48.  Specifically, in January 2008, Dr. Hammad stated that "Overall, the

patient is doing very well" as she had been taking her medications which provided

"significant relief."  R. 752.

In February 2008, Dr. Hammad wrote that "Patient has been doing relatively well.

She is taking the medications as prescribed.  Her headaches are controlled.  There has

been no flare up of the psoriasis."  R. 749.  In March 2008, Plaintiff reported having two

migraines since her last visit, and Dr. Hammad wrote "Patient has been doing relatively

well . . . Lortab [is] providing her with significant relief."  R. 747.

In April 2008, Dr. Hammad noted that Plaintiff continued to take Lortab as needed, which is helping.  R. 744.  In June 2008, Dr. Hammad reported that Topamax helped Plaintiff "significantly" and "[o]verall the patient is doing fine."  R. 741.  Dr. Hammad reiterated, in July 2008, that "[o]verall the patient is doing well." R. 739.

In August and September 2008, Plaintiff reported headaches again, but she had reduced her Topamax dosages.  R. 728, 731, 736.  Dr. Hammad scheduled Plaintiff for a repeat occipital nerve block.  R. 737.  After receiving the block, Plaintiff's migraines decreased from daily to twice weekly.  R. 731.

In October 2008 and November 2008, Plaintiff reported that she was currently doing well with her medications; her headaches were less frequent since the occipital nerve blocks, but that she was still having migraines twice a week.  R. 722, 725.  She also reported increased back pain as she had been traveling back and forth to Jacksonville because of her husband's medical condition.  R. 725.

The last treatment note is dated February 17, 2009.  R. 719.  At that time, Plaintiff complained of headaches and back pain, but she was out of her medication "for a little while."  R. 719.  During this time period, the only negative clinical observations consisted of some arthritic changes in the hands and paraspinal mid lumbar tenderness. R. 719-32, 736-37.  Overall, Dr. Hammad's physical examination findings dated April 2006 through February 2009 consistently revealed normal muscle bulk and tone; no atrophy, with full muscle strength in all extremities; full and painless range of motion, normal reflexes, good coordination, normal sensation, normal gait, and normal station

normal mood and affect; and recent and remote memory intact.  R. 293, 295, 297, 299, 303, 345, 347, 350, 452, 719-20, 722-23, 725-26, 728-29, 731-32, 736-37, 739-42, 744-45, 747-48, 749-50, 752-53, 754, 756, 758.

### e. Hulon Crayton, M.D.

Plaintiff saw Dr. Crayton in July 2006, for evaluation of arthritis in her hands. R. 391.  Plaintiff reported that the cortisone injections Dr. Hammad gave her for migraines temporarily improved her hand pain.  R. 391.  Dr. Crayton observed synovitis of the second and third metacarpophalangeal joints and redness over the entire flexor tenosynovial sheath.  R. 392.  Dr. Crayton diagnosed psoriatic arthritis and treated Plaintiff with Remicade IV therapy.  R. 390, 392; *see* R. 440-47 (patient/therapy notes from July 10, 2006, to Jan. 4, 2007, describing the results of the Remicade IV therapy).

On March 1, 2007, Plaintiff reported that the Remicade was wearing off before her next treatment was due and she had been having increased back pain.  She requested monthly treatments.  R. 438.  Plaintiff reported losing muscle tone and "her butt is dropping."  Dr. Crayton noted an area of lipodystrophy in the left buttock with etiology unclear.  Methotrexate was added to Plaintiff's medicine regimen.  R. 438.  On March 14, 2007, Dr. Crayton reported the results of a dexa bone densitometry of the lumbar spine.  R. 684.  His impression was normal quantitative bone mineral density of the lumbar spine.  R. 684.  Plaintiff received Remicade IV therapy on April 9 and June 4, 2007. R. 436-37.  On March 20, 2007, Plaintiff had MRIs of her left and right hands and the impressions were small scoop erosion at the third metacarpal head and erosion of the

third metacarpal head, respectively. Significant synovitis and pannus formation were not seen. R. 682-83.

On January 14, 2008, Plaintiff reported that the Remicade had been wearing off every six weeks, rather than eight weeks, and that her pain medication was not helping reduce her pain. R. 707. Dr. Crayton switched Plaintiff's Remicade IV therapy to every six weeks. R. 705; *see* R. 700-06. Following the increased dosage, on July 9, 2008, Dr. Crayton stated that Plaintiff is doing well with respect to her arthritis and skin and that the Remicade is working very well. R. 699. On August 18, 2008, Plaintiff "voiced no new complaints," although she was despondent because her husband needed a heart transplant. R. 697; *see* R. 695-96 (two Remicade IV therapies on Sept. 20, 2008, and Nov. 10, 2008).

### 2. Examining Medical Sources

### a. Carla M. Holloman, D.O.

On March 6, 2007, Dr. Holloman conducted a physical consultative examination of Plaintiff at the Commissioner's request. Dr. Holloman noted that Plaintiff was applying for disability based on psoriatic arthritis and depression. R. 394-99. Dr. Holloman reviewed Plaintiff's past medical history, past surgical history, medications, social and family history. R. 394-95. Dr. Holloman observed that Plaintiff was "in no acute distress," had a normal gait without use of an assistive device. R. 395. Dr. Holloman found no clubbing, cyanosis, or edema. R. 395. Plaintiff had full grip and muscle strength throughout, although swelling was noted at the MIP joints of the fingers. She did have ridging in her fingernails and swelling in her fingers, but no other joints

had swelling, tenderness, or increased calor.  R. 395.  Plaintiff had no neurological

deficits, R. 395, and her spine and extremities were in good alignment.  R. 396.  Finally,

range of motion testing showed full range of motion of Plaintiff's cervical spine, lumbar

spine, shoulders, elbows, wrists, hands, hips, knees, and ankles.  R. 397-98.

### b. Mohamed Hussein, MSA, RPT

Mohamed Hussein, MSA, RPT, a physical therapist, conducted a functional

capacity evaluation on June 25, 2008.  R. 690-94.  Mr. Hussein opined that Plaintiff

could not return to work as a Day Worker defined in the DOT as medium strength work.

He also opined that Plaintiff could perform work in the light strength category that did

not require standing more than 23 minutes continuously; walking more than .01 miles

continuously; no pushing/pulling more than 20 pounds; no balancing activities that

require standing, crouching, or walking; no reaching, crouching, kneeling, or crawling on

hands and feet; and no key-pinching with the left hand.  R. 693.

### 3. State Agency Reviewing Physicians

In April 2007, Edward Holified, M.D., opined that Plaintiff retained the ability to

perform the full range of light work. R. 425-32.  Similarly, in August 2007, Ronald Kline,

M.D., a state agency physician, opined that Plaintiff retained the ability to perform light

work, with occasional postural activities.  R. 579-85.

**C. Psychological Evidence**

**1. Treating Medical Sources**

**a. Linzey Faison Mental Health Associates, Inc.**

At Plaintiff's request, Dr. Padgett referred her to this facility after she reported

stress and anxiety related to her husband's upcoming heart surgery.  R. 274.  As noted

above, Dr. Padgett also wrote Plaintiff a note stating that she will need to use additional

sick leave, R. 317, and he completed forms for unemployment disability.  R. 273.

At Plaintiff's first visit, on August 16, 2006, Plaintiff was diagnosed, in part, with

"Bipolar I disorder do [sic] most recent episode depressed in partial remission" and

obsessive thoughts and compulsive thoughts based on her report of "constant cleaning"

and worrying about the spread of herpes (which Plaintiff did have) and other germs.

 R. 310, 552-56, 594.  Plaintiff's Global Assessment of Functioning (GAF) score was 50.

R. 310.[3]

---

[3]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000) includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing the GAF scale).  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir.

The remainder of the medical records from this facility generally includes psychotherapy notes authored by Kathryn M. Land, ARNP, a nurse practitioner. R. 318-19, 524-51, 586-88, 593-94, 623-27, 632-33. In a patient note that seems to be a part of the September 16, 2006, assessment, Plaintiff reported denying having hallucinations or delusions. R. 556. On September 5, 2006, Plaintiff reported having rapid mood swings and hearing voices. Ms. Land gave her a note stating that she was currently unable to work. On September 19, 2006, Plaintiff continued to report hearing voices and Ms. Land gave her another note that she was unable to work. R. 318-19, 548-51. On October 19, 2006, Plaintiff stated that she was doing worse, such as, seeing shadows; waking up five to six times a night; reporting a lack of energy; inability to remember; and anxious. R. 546-47. On November 9, 2006, Ms. Land prescribed Plaintiff Seroquel and Plaintiff was overall a little better and was working on helping the disadvantaged children with Christmas gifts and was motivated to work for the foster kids. R. 542-45. On November 30, 2006, most of Plaintiff's symptoms improved, R. 542; Seroquel was helping although Plaintiff was "still hearing voices a little bit, but they have improved significantly;" and "still is trying to raise money for Jackson Co. foster kids." R. 543. Plaintiff continued to do well in December 2006 as she "feels like she is doing much better on Seroquel than on anything else she has taken in the past 17 years." She is able to sleep through the night; not hearing voices; but still cannot focus on the television like she used too. R. 540-41, 536-37.

In early January 2007, Plaintiff reported worsening symptoms due to stress,

2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).

R. 534-35, but then reported improvement at her next visit on January 18, 2007.

R. 532. On February 8, 2007, Plaintiff reported feeling "a little depressed," and having back pain after attending a Valentine's Day dance the night before. R. 530-31. At her next visit, on April 3, 2007, Plaintiff complained that her physical pain was making her irritable and depressed. It was noted Plaintiff had applied for Social Security benefits. R. 528-29.

Her next visit was not until June 19, 2007, when she reported feeling very depressed because she was turned down for Social Security disability and she had no money. R. 527. Plaintiff denied having auditory or visual hallucinations. R. 526-27. Again, on July 10, 2007, Plaintiff reported worsening symptoms and she was anxious because she does not have money, her husband was turned down for disability, and her son was having kidney problems. R. 524-25. Ms. Land advised Plaintiff to continue with her medications. R. 524-25.

On August 14, 2007, Plaintiff reported that "things couldn't get any worse" as her husband was on oxygen and her son was diagnosed with arthritis and was depressed R. 622-23. Ms. Land advised Plaintiff to continue with her treatment. R. 622-23. On September 11, 2007, Plaintiff initially reported feeling depressed and stressed due to financial problems and having been turned down again for Social Security disability. R. 625. On September 25, 2007, she reported that her neurologist increased her Ultram and that she felt better and was not in as much pain. R. 626-27.

On December 4, 2007, Ms. Land completed a form on which she opined that Plaintiff had either a marked or extreme impairment in every area of functioning with the

exception of a mild impairment in the ability to ask simple questions and request assistance. R. 586-87. It appears Plaintiff's last visit with Ms. Land was on January 8, 2008. R. 632. On May 9, 2009, Plaintiff was seen by Dr. Sterling, although the patient notes are cryptic. R. 775. Plaintiff's condition had worsened, but sleep was noted as good. Plaintiff reported being stressed with family dynamics; her husband's and mother's illnesses; pending Social Security decision; and depression. There were no treatment plan changes. R. 776.

### 2. Examining Medical Sources

### a. Lawrence V. Annis, Ph.D.

On March 14, 2007, Dr. Annis conducted a psychological evaluation of Plaintiff at the Commissioner's request. R. 400-03. Dr. Annis reviewed Plaintiff's medical history, personal history and occupational history. R. 400-01. Dr. Annis observed that Plaintiff maintains good eye contact; overall activity level is appropriate; had normal psychomotor activity and she had no apparent difficulties in her posture, gait, and coordination. R. 401. Plaintiff was polite and cooperative, had normal speech, and understood comments and questions without difficulty. R. 401. Dr. Annis described Plaintiff's mood as "anxious." R. 401. Although Plaintiff described her own mood as sad, she was not tearful during the interview. R. 401. She also endorsed thoughts of suicide, but stated she would not attempt suicide because of the effect that would have on her family. R. 401.

Dr. Annis found Plaintiff's thought process to be rational and coherent, but often emotional. R. 401. Plaintiff attended well to the interview and assigned tasks without

distraction, R. 401, but her memory was below average in all areas tested. R. 402. Although Plaintiff endorsed having hallucinations, Dr. Annis did not observe signs of hallucinations during the interview. R. 402.

Dr. Annis made several diagnoses: major depressive disorder, recurrent; psychotic disorder mot otherwise specified; amnestic disorder, not otherwise specified; pain disorder associated with a general medical condition, chronic; and nicotine dependence. R. 402.

Ultimately, Dr. Annis opined that Plaintiff's impairments would present a major handicap to normal social, academic, and occupational performance and this appears to be a long-term pattern. R. 402. With regard to activities of daily living, Dr. Annis stated that Plaintiff sees to her immediate needs, does basic homemaking chores, and seeks assistance meeting demands that require physical agility, strength, and stamina. R. 403. With regard to social functioning, Dr. Annis opined that Plaintiff "appears able to a limited degree to interact appropriately with people she does not know. R. 403. He opined that her current mental condition would reduce her ability to participate in social interactions requiring patience in difficult situations, careful attention, and protracted concentration. R. 403.

Finally, with regard to the ability to work, Dr. Annis stated:

> Occupational achievement appears to be impeded. If Ms. Register's physical condition permits work, she would require more encouragement than do most people when encountering work difficulties or social challenges. She would probably not do well in occupations requiring frequent, protracted or demanding social interaction, such as a receptionist, restaurant server, cashier, or sales clerk. Due to apparent poor memory and her distraction to physical and emotional factors, she should presently avoid employment at occupations

requiring technical precision, driving, operating machinery, or contact with dangerous substances.

R. 403.

### 3. State Agency Reviewing Medical Sources

On March 2007, Jill Rowan, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique (PRT) and opined that Plaintiff had *mild* restriction of activities of daily living and difficulties in maintaining social functioning; *moderate* difficulties in maintaining concentration, persistence, or pace; and *no* episodes of decompensation, each of extended duration. R.417. In a Medical Residual Functional Capacity Assessment, Dr. Rowan opined that Plaintiff retained the mental ability to relate and go along with others; she could understand and carry-out simple, routine, repetitive tasks; she could sustain pace for such tasks; and she could effectively express herself and adjust to changes in a work-setting. R. 421-23.

On August 15, 2007, Carol Deatrick, Ph.D., also a state agency psychologist, completed a Medical Residual Functional Capacity Assessment and opined that Plaintiff may have difficulty with complex tasks, but appears capable of routine repetitive tasks per objective data; shows some deficits in concentration, persistence, and pace, but is capable of performing routine, repetitive tasks, per review of MER; and is capable of very basic socialization, per objective MER; and that Plaintiff's adaptive skills are essentially intact, per objective MER. R. 560-62. Dr. Deatrick also completed a PRT and reached the same conclusions as Dr. Rowan, except she felt that Plaintiff had *no* restrictions of activities of daily living. R. 574.

On April 9, 2007, Edward Holifield, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment. R. 425-32. Dr. Holifield opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; could sit (with normal breaks) for a total of about six hours in an eight-hour workday; and could push and/or pull at unlimited. R. 426. Dr. Holifield found Plaintiff had no limitations. R. 427-29.

Ronald Kline, M.D., also a state agency consultant, completed a Physical Residual Functional Capacity Assessment. R. 578-85. He reached the same conclusions regarding Plaintiff's exertional limitations. R. 579. Dr. Kline reached the same conclusions regarding other limitations, except he opined, regarding postural limitations, that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl. R. 580.

## V. Legal analysis

### A. The ALJ accounted for the functional limitations identified by Dr. Annis when he assessed Plaintiff's RFC.

Plaintiff argues that the ALJ erred when he failed to address the whole opinion of Dr. Annis, an examining physician, who, according to Plaintiff, significantly limited Plaintiff beyond the ALJ's RFC. Doc. 14 at 4-11.

The ALJ reviewed the relevant medical evidence and limited Plaintiff to unskilled work; no more than occasional contact with the general public; no driving; and no exposure to hazardous machinery. R. 26.

Dr. Annis was well-informed of Plaintiff's medications, personal history, and occupational history.  R. 400-01.  He made numerous behavior observations that included Plaintiff's mood and affect, quality of thinking, concentration, orientation, memory, orientation, and hallucinations and perpetual disturbances, and memory. R. 401-02.  Dr. Annis accounted for Plaintiff's activities of daily living and social functioning.  R. 403.

In the last section of his report, Dr. Annis discussed Plaintiff's ability to perform work-related activities.  R. 403.  First, Dr. Annis assumed that if Plaintiff's physical condition permitted work, "she would require more encouragement than do most people when encountering work difficulties or social challenges."  R. 403.  Dr. Annis then outlined the specific work difficulties or social challenges that Plaintiff should avoid, which the ALJ accounted for in the RFC.

Regarding social challenges, Dr. Annis stated that Plaintiff should avoid "occupations that require frequent, protracted, or demanding social interaction, such as receptionist, restaurant server, cashier, or sales clerk."  R. 403.  The ALJ limited Plaintiff's interaction with the general public to no more than occasional and further limited Plaintiff to unskilled work which "ordinarily involve[s] dealing primarily with objects, rather than with data or people[.]"  Social Security Ruling (SSR) 85-15.  These limitations adequately account for the social challenges identified by Dr. Annis because they shield Plaintiff from frequent, protracted, or demanding social interaction.

Regarding work difficulties, Dr. Annis stated: "Due to apparent poor memory and her distraction to physical and emotional factors, [Plaintiff] should presently avoid

occupations requiring technical precision, driving, operating machinery, or contact with dangerous substances." R. 403. The ALJ accounted for Plaintiff's need to avoid jobs with technical precision by limiting her to unskilled work. Basic mental demands of unskilled work are not onerous; rather, such work requires the ability to understand, carry out, and remember only simple instructions. *See* SSR 85-15. ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base."); 20 C.F.R. § 404.1568(a) ("[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.") The ALJ also limited Plaintiff to work that does not involve driving, or exposure to hazardous machinery. R. 26. Although the ALJ omitted Dr. Anderson's finding that Plaintiff should avoid contact with dangerous substances, this omission appears to be harmless error as the occupations identified do not, according to the <u>DOT</u>, require any exposure to dangerous substances. R. 42, 53-54.

Plaintiff also contends that the ALJ did not account for Dr. Annis's observations under the heading "social functioning. Doc. 14 at 9-11. This argument is not persuasive.

As noted above, Dr. Annis made numerous observations and findings in transform those into specific work-related limitations, which included social challenges. Dr. Annis observed that Plaintiff "appears able to a limited degree to interact appropriately people she does not know." He further stated that Plaintiff is "socially handicapped by depression and anxiety, and possibly by memory problems" and that "[t]he current mental condition would be expected to reduce her ability to participate in social interaction requiring patience in difficult situations, careful attention, and protracted concentration." R. 403. The ALJ limited Plaintiff's exposure to difficult social situations by limiting her to only "occasional contact with the general public" and unskilled work that ordinarily requires working with things rather than people. R. 26; *see* SSR 85-15. The ALJ expressly found that Plaintiff "is limited to unskilled work with no driving involved and cannot work with hazardous machinery" and these findings account for Plaintiff's reduced ability to maintain careful attention and protracted concentration.

Finally, Dr. Annis did not find that Plaintiff was totally precluded from dealing with others, and the record supports a finding that Plaintiff retained some ability to interact with others. *See*, *e.g.*, R. 148, 160 (stating she often goes to the Corner Stone Restaurant and sits and talks him with people); R. 542-43 (Nov. 9, 2006--working on helping foster children with Christmas gifts and motivated to work for the foster kids); R. 543 (Nov. 30, 2006--raising money for Jackson Co. foster kids); R. 530-31 (Feb. 8, 2007--documenting Plaintiff's attendance at a Valentine's Day dance).

Although there is evidence that detracts from the ALJ's conclusions, nonetheless, substantial evidence supports the ALJ's inclusion of the limitations identified in

Dr. Annis's report under the heading "ability to perform work-related activities." R. 403.

### B.  The ALJ properly weighed the medical source opinions in formulating Plaintiff's RFC.

Plaintiff asserts that the ALJ did not properly consider the medical source opinions of Mr. Hussein, Dr. Hammad, Dr. Annis, or Ms. Land when formulating Plaintiff's RFC.  Doc. 14 at 12-22.  Under this argument, Plaintiff also suggests that the ALJ failed to outline a function by function assessment citing the ALJ's failure to credit the opinions of Mr. Hussein, Dr. Hammad, Dr. Annis, and Ms. Land, doc 14 at 12-13, and that the ALJ did not afford proper weight to the opinions of Dr. Hammad and Ms. Land, doc. 14 at 13-22.  These issues are discussed under this section because they involve argument regarding the ALJ''s evaluation of the medical source evidence.

At the fourth step of the sequential evaluation process, the ALJ must assess the claimant's RFC.  20 C.F.R. § 404.1520(a)(4)(iv)-(v).  The RFC represents the most the claimant can do despite her credible impairments and it is based upon all of the relevant medical and other evidence in the record.  20 C.F.R. § 404.1545(a)(1).  Opinions concerning a claimant's disability or RFC are reserved to the Commissioner.  20 C.F.R. § 1527(d)(2).

The ALJ should also evaluate the medical source opinions in assessing the RFC. 20 C.F.R. § 404.1527(b).  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments, including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the

claimant's] physical or mental restrictions" that reflect judgments about what the claimant can still do despite her impairments. 20 C.F.R. § 404.1527(b). Several factors should be considered including the treatment and examining relationship between the claimant and the physician, the extent to which the medical sources opinion is supported by medical signs and laboratory findings, consistency of the opinion to the evidence of record as a whole, whether the medical source is a specialist, and any other relevant factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6).

"In addition to evidence from the acceptable medical sources listed in 20 C.F.R. § 404.1513(a), the Commissioner "may also use evidence from other sources to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d). Relevant here, these sources include nurse-practitioners and therapists. 20 C.F.R. § 404.1513(d).(1).

Not infrequently, there are conflicting medical source and other source opinions. Sometimes these opinions also conflict with the opinions of state agency, non-treating medical and psychological consultants. The ALJ must consider these findings, but is not bound by their findings. *See* 20 C.F.R. § 404.1527(e)(2)(i). The ALJ is required to resolve any conflicts. *See generally* Richardson v. Perales, 402 U.S. 389, 399 (1971).

Mr. Hussein is a physical therapist, which is not an acceptable medical source. 20 C.F.R. § 404.1513(a). The Commissioner evaluates opinions from other sources, however, "to show the severity of [the claimant's impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d).

The ALJ observed that Mr. Hussein's opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques, and it not consistent with reports of other sources who have examined Plaintiff or reviewed the record.  R. 33, 38. Mr. Hussein did not treat Plaintiff, his report does not identify objective medical science from a physical dissemination, and there is no indication that Mr. Hussein reviewed any medical documentation in formulating his opinions.  R. 690-94.  Substantial evidence supports the ALJ's consideration of Mr. Hussein's opinion and the "[l]imited evidentiary weight" given to the opinion of Mr. Hussein.  R. 38.

Mr. Hussein's opinion rendered on June 25, 2008, is inconsistent with the essentially normal physical findings that support the ability to perform light work activities, and Dr. Clayton's treatment note of July 9, 2008, when after receiving an increased dosage of Remicade IV therapy, Dr. Crayton stated that Plaintiff is doing well with respect to her arthritis and skin and that the Remicade is working very well. R. 699.  On August 18, 2008, according to Dr. Crayton, Plaintiff "voiced no new complaints," although she was despondent because her husband needed a heart transplant.  R. 697.

Further, throughout the record, physical examinations consistently revealed normal muscle bulk and tone, no atrophy, full muscle strength in all extremities, peaceful and painless range of motion, normal reflexes, good coronation, normal sensation, normal gait, and normal station.  *See, e.g,* R. 258-59, 293, 297, 299, 303, 345, 347, 350, 395, 452, 719-20, 722-23, 725-26,728-29, 731-32, 736-37, 739-42, 744-

45, 747-48, 749-50, 752-53, 754, 756, 758.  In light of the noted conflicts, substantial

evidence supports the ALJ's reasons for discounting Mr. Hussein's opinion.

Next, the ALJ considered, but gave "[l]ittle weight" to the opinion of Dr. Hammad,

treating physician, because it "is marked with internal inconsistencies."  R. 38-39.  As

noted herein, the opinion of a treating physician must be given substantial or

considerable weight unless god cause is shown to the contrary.  Lewis, 125 F.3d at

1440; *see supra* at 8.

On one form, Dr. Hammad indicated that Plaintiff could sustain an eight-hour

workday (sit for four to six hours and stand or walk for two hours in an eight work-day).

R. 630.  He could not predict the number of days Plaintiff would be absent from work--it

depended on pain.  R. 630.  Dr. Hammad's basis for these restrictions was "Patient with

arthritic pain that can limit function."  R. 630.  Yet, on the same date, Dr. Hammad also

opined that Plaintiff's pain would be so distracting that it would prevent her from

adequately performing daily activities, work, or from completing tasks and that regarding

side effects of medication, there may be some limitations but not to such a degree as to

create serious problems in most instances.  R. 631.

Moreover, Dr. Hammad's opinion is inconsistent with his physical and mental

examination findings.  Overall, Dr. Hammad's physical examination findings dated April

2006 through February 2009 consistently revealed normal muscle bulk and tone; no

atrophy, with full muscle strength in all extremities; full and painless range of motion,

normal reflexes, good coordination, normal sensation, normal gait, and normal station

normal mood and affect; and recent and remote memory intact.  R. 293, 295, 297, 299,

303, 345, 347, 350, 452, 719-20, 722-23, 725-26, 728-29, 731-32, 736-37, 739-42, 744-45, 747-48, 749-50, 752-53, 754, 756, 758.   Dr. Hammad also found Plaintiff to have normal concentration, attention, and memory (immediate, short-term, and long-term). R. 293, 295, 297, 299, 303, 345, 347, 350, 451, 719, 722, 725, 728, 731, 736, 741, 747-48, 749, 752, 754, 756, 758.   Dr. Hammad reported that Plaintiff could follow simple and complex commands, perform calculations, engage in abstract taking, spell "world" backward and forward without difficulty, and recall three out of three objects after five and ten minutes.   R. 293, 295, 297, 299, 303, 345, 347, 350, 451, 719, 722, 725, 728, 731, 736, 741, 747, 749, 752, 754, 756, 758.   Given the record documentation, substantial evidence supports the ALJ's determination to give "little weight" to the opinion of Dr. Hammad.

The ALJ referred to the applicable standard used to assess the opinion of Ms. Land, an Advanced Registered Nurse Practitioner.   R. 38.   The ALJ "concluded that the opinion of Ms. Land is not entitled to controlling or substantial weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the reports from the other sources who have examined the claimant.   Ms. Land's opinion is inconsistent with the opinion of the medical consultants for the State Agency who reviewed the record."   R. 37.   The ALJ further stated:

> Although Ms. Land was a treating source, her treatment records do not corroborate the limitations that she identified.   Her opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques, and it is inconsistent with the medical opinions of the State agency medical consultants. Ms. Land indicated the claimant had extreme limitations in her ability to get along

with co-workers or peers, attend meetings, (church, school, lodge, etc) or to
socialize with friends and neighbors; however, her note [sic] reflect the claimant
reported attended [sic] multiple social events including valentines [sic] dances
and Christmas parties for foster children.  The claimant also organized fund
raising for the foster children.

R. 38.

Substantial evidence supports the ALJ's determination to discount Ms. Land's

opinion because they are not supported by medically acceptable clinical laboratory

diagnostic techniques.  *See* 20 C.F.R. § 404.1527(c)(3).  Also, Ms. Land's therapy notes

do not contain mental status examination findings and instead they tend to memorialize

Plaintiff's subjective complaints.  (There is a mental status examination from Linzey

Faison Mental Health Associates, Inc., which appears to be part of an initial intake

meeting dated August 16, 2006, which is unsigned.  R. 556, 593-94.  Plaintiff's mood is

anxious; her affect is expanded; Plaintiff denied hallucinations and delusions were

absent; her attention span was good and she was oriented regarding person, place,

time, and situation.  Plaintiff's memory and abilities to calculate and abstract were not

rated as abnormal.  Nevertheless, several diagnoses were made.  R. 556, 593.)  *See*

Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996).

In addition, Ms. Land's opinion is inconsistent with the mental status findings

documented by Dr. Hammad.  As noted above, Dr. Hammad's mental status

examinations described plaintiff as alert and oriented with normal affect, mood,

concentration, attention, judgment, and memory (immediate short-term and long-term).

R. 293, 295, 297, 299, 303, 345, 347, 350, 451, 719, 722, 725, 728, 731, 736, 741, 747-

48, 749, 752, 754, 756, 758.  Dr. Hammad reported that Plaintiff could follow simple and

complex commands, perform calculations, engage in abstract taking, spell "world" backward and forward without difficulty, and recall three out of three objects after five and ten minutes.  R. 293, 295, 297, 299, 303, 345, 347, 350, 451, 719, 722, 725, 728, 731, 736, 741, 747, 749, 752, 754, 756, 758.  Further, Ms. Land's opinion is inconsistent with Dr. Annis's findings which are not work-preclusive.  Substantial evidence supports the ALJ's determination that Ms. Land's opinion "is not entitled to controlling or substantial weight."  R. 37; *see* 20 C.F.R. § 404.1527(c)(4).

## V.  Conclusion

Plaintiff has the burden to prove she is disabled.  <u>Moore</u>, 405 F.3d at 1211.  The record does not support Plaintiff's assertion of disability, that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).  Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED.**

**DONE AND ORDERED** at Tallahassee, Florida, on May 10, 2013.


**s/ Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**